# EXHIBIT A

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 16 0398 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| PLAINTIFF(S): | Laughlin Kennel Company | COUNTY | Worcester |
|---|---|---|---|
| ADDRESS: | 11 Larned Road Oxford Ma | | |
| | | DEFENDANT(S): | GateHouse Media Inc. |

| ATTORNEY: | John L. Fink |
|---|---|
| ADDRESS: | |
| 18 Lyman st. Suite 208, J&N Blding Westboro MA 01581 | |
| BBO: | 683290 |

ADDRESS: 100 Front st, PO Box 15012, Worcester MA 01615

## TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| b15 | Defamation | A | ☒ YES ☐ NO |

*If "Other" please describe:

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
    1. Total hospital expenses ............................................................. $ _____
    2. Total doctor expenses ............................................................... $ _____
    3. Total chiropractic expenses ...................................................... $ _____
    4. Total physical therapy expenses .............................................. $ _____
    5. Total other expenses (describe below) ..................................... $ _____
                                             Subtotal (A): $ _____

FILED
MAR 15 2016
ATTEST [signature] CLERK

B. Documented lost wages and compensation to date ............................... $ _____
C. Documented property damages to dated ............................................. $ _____
D. Reasonably anticipated future medical and hospital expenses ............. $ _____
E. Reasonably anticipated lost wages .................................................... $ _____
F. Other documented items of damages (describe below) ........................ $ 36,000

G. Briefly describe plaintiff's injury, including the nature and extent of injury:
Loss of business revenue

                                      TOTAL (A-F):$ 36,000

### CONTRACT CLAIMS
(attach additional sheets as necessary)

Provide a detailed description of claims(s):

                        TOTAL: $ _____

Signature of Attorney/Pro Se Plaintiff: X [signature] BBO C83290     Date: 3/11/16

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

## CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X [signature]     Date: 3/11/16

| CIVIL TRACKING ORDER (STANDING ORDER 1- 88) | DOCKET NUMBER 1685CV00398 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Laughlin Kennel Company vs. Gatehouse Media Inc. Doing Business as Worcester Telegram and Gazette | Dennis P. McManus, Clerk of Courts |
|---|---|
| TO: File Copy , | COURT NAME & ADDRESS Worcester County Superior Court 225 Main Street Worcester, MA 01608 |

## TRACKING ORDER - A - Average

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION

### DEADLINE

| STAGES OF LITIGATION | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 06/13/2016 | |
| Response to the complaint filed (also see MRCP 12) | | 07/13/2016 | |
| All motions under MRCP 12, 19, and 20 | 07/13/2016 | 08/12/2016 | 09/12/2016 |
| All motions under MRCP 15 | 05/09/2017 | 06/08/2017 | 06/08/2017 |
| All discovery requests **and depositions** served and non-expert despositions completed | 03/05/2018 | | |
| All motions under MRCP 56 | 04/04/2018 | 05/04/2018 | |
| Final pre-trial conference held and/or firm trial date set | | | 09/03/2018 |
| Case shall be resolved and judgment shall issue by | | | 03/15/2019 |

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED 03/15/2016 | ASSISTANT CLERK Laurie Jurgiel | PHONE (508)831-2350 |
|---|---|---|

SCV026i  11/2014

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT

Worcester, ss.

Superior Court Division
of the Trial Court

| Laughlin Kennel Company |
| Plaintiff, |
| v. |
| Gatehouse Media Inc. DBA Worcester Telegram and Gazette |
| Defendant. |

16--0398

Civil Action Number: _____

**Civil Complaint**
**Jury Trial Requested** **FILED**

**MAR 15 2016**

ATTEST: _____ CLERK

## I.   Introduction



This action arises out of a front-page article published by the Defendant, in their Telegram and Gazette newspaper, authored by Paula Owen published on January 3, 2016 and entitled "Watchdog Report: Oxford dog breeder may benefit from officials' ignorance of law." The article was written in advancement of a personal vendetta by the author against an employee of the kennel as well as the author's political and philosophical beliefs against the pet industry.

The author, Paula Owen, initially began the story based on an article she read on an anonymous online blog. The author reached out to the kennel concerning their vaccination procedures (the thrust of the anonymous blog) and was provided with the name of the appropriate regulator to contact, the most recent inspection report, and a general statement concerning the legality of the procedures involved. Having the main focus of her story proven false, the author then proceeded to willfully ignore and intentionally prevent herself from learning anything else which might cause her article to be less hard hitting and sensational.

In the article the Defendant directly and through insinuation falsely accuses the Plaintiff of: keeping animals in inhumane conditions; of operating solely based on an oversight by the

1

town of Oxford Ma; of overcrowding their kennel; of purchasing pups less than eight weeks of age in violation of law and regulations; of failing to provide animals care after 5pm; of illegally purchasing puppies from non-USDA breeders; of illegally breeding their own dogs in violation of the USDA regulations; of preventing regulators from accessing the whole property; of not refunding a deposit when a puppy was unavailable for sale; of keeping puppies in tiny cages; of withholding the identity of puppies' breeders until after sale, and; of being "unlikely to win state licensing approval" if the kennel applied today.

All of the above accusations are demonstrably false and published only as a result of reckless disregard for the truth, or in some instances, simply lying by insinuation.

## JURISDICTION AND VENUE

1.  The Superior Court has jurisdiction over this matter because the causes of action arise in Massachusetts state tort law; damages are likely to exceed $25,000.00. Venue is proper in Worcester County as the Plaintiff and the Defendant's business which is associated with this action are located in Worcester County.

## PARTIES

2.  Plaintiff, Laughlin Kennel Company, is a Massachusetts Corporation with a principal place of business at 11 Larned Rd. Oxford Massachusetts, which is privately held and not publically traded.

3.  At all times mentioned, the Defendant Gatehouse Media Inc. was and still is the owner and publisher of a certain newspaper published in the City of Worcester with general circulation in and around Worcester County known as the Worcester Telegram and Gazette. Defendant has a principal correspondence address for the newspaper at 100 Front St, P.O. 15012,

2

Worcester MA 01615-9100, and a registered agent for service of process c/o Corporation

Service Company, 84 State Street, Boston MA 02109.

## FACTUAL INTRODUCTION

4. 2. On January 3, 2016 the defendant maliciously published in the newspaper concerning plaintiff the following matter, the whole of which is attached as exhibit A:

### Watchdog Report: Oxford dog breeder may benefit from officials' ignorance of law

OXFORD - A longtime commercial dog breeder and seller, a target of frequent customer complaints and protests, may be benefiting from government officials' ignorance of the law and inattention.

...

Town officials are confused about their authority to regulate the business, and a state official says such a business in its current location would not now likely win state licensing approval.

And some customers of the kennel and pet store continue to allege they were sold sick puppies - some that died shortly after they bought them. Moreover, the customers say local and state officials ignore allegations of poor treatment of the animals at the business.

...

Robert Fink, who owns Laughlin Kennel with his wife, Bridgette, denies allegations of inhumane conditions at the business. In an email to the Telegram & Gazette, Mr. Fink also said he does not sell sick puppies.

...

The town only has the authority to license and inspect the kennels and breeding operation; and the DAR licenses and inspects the pet store, according to the state agency.

...

On the town's kennel application, there are three choices: four or fewer dogs, 10 or fewer dogs, or 10 or more dogs. When a reporter asked Town Clerk Lori A. Kelley why there was no upper limit to prevent kennels from having hundreds of dogs, she replied that it was state law not to limit it.

However, according to the DAR, that is not accurate.

"The town has the authority to place an upper limit. That would be up to the ACO (animal control officer) and the town clerk," DAR spokeswoman[1] Katie Gronendyke said in an email.

...

Laughlin Kennel employees - often teenagers - are on site from about 8:30 a.m. to 5 p.m., Ms. Casavant said. No one is there after 5 p.m. to take care of problems that might arise, she said.

...

---

[1] Katie Gronendyke is listed on the Commonwealth's website as a spokeswoman for the Executive Office of Energy and Environmental Affairs, and her email exchange with Paula Owen identifies her department as EEA, it is not clear if Ms. Gronendyke identified herself as a spokeswoman for the DAR in a telephone conversation.

3

"The barking that comes from there at night is sometimes unbelievable," she said. "Every Tuesday or Wednesday, the trucks arrive from the puppy mills to unload their cargo. We can hear the pitiful crying of the puppies as they sit in cages in the cold darkness of the trucks in the winter or the sweltering heat of summer, sometimes for hours."

Former employees took videos and photos showing the conditions at the business, she said. Some were sent to the DAR.

...

Courtney L. Derochea, research director for the Massachusetts Coalition to End Puppy Mills, said reports of sick puppies purchased from Laughlin and families stuck with thousands in vet bills are common.

...

On its website, Laughlin Kennel says it is a pet shop licensed by the DAR with a kennel license from the town. It says it buys from USDA-licensed breeders, but there is no indication it is inspected by the USDA.

Federal regulations require breeders who supply puppies to pet stores to be inspected and licensed by the USDA.

...

Another problem customers encounter is that the name of the breeder is often not provided until a purchase is complete, she said, which gives prospective buyers little or no time to research where the puppy is coming from.

...

"We've recently reported Pinnacle Pets to the USDA for possibly receiving underage puppies," Ms. Summers said. "They are under investigation."

Puppies must be at least eight weeks old before leaving a breeding facility, she said. The Humane Society has submitted a complaint, she said, that Pinnacle is getting puppies from breeders from Ohio that sell underage puppies - some only about six weeks old at risk of becoming sick, she said.

In those cases, very young pups take the journey by truck from Ohio to Missouri and then are resold and shipped by truck to Laughlin and other pet stores in the Northeast, she said, traveling more than 1,850 miles.

"There are thousands of puppies moving through Pinnacle yearly," Ms. Summers said.

Also, the society has documentation that Pinnacle buys from unlicensed breeders, she said.

One of the breeders Laughlin buys from directly also was not licensed by the USDA, she said, though the business claims all of their breeders are licensed.

"We pull a sampling of small-animal health certificates that travel with the dog when it crosses state lines," Ms. Summers said. "According to these documents, one person doesn't have a USDA license."

...

Michael Cahill, director of the division of animal health at the DAR, said there is an "unwritten" policy not to license pet stores in homes any longer because inspectors have had trouble gaining access to some in the past. He said there are only a "handful" left in the state.

As far as conditions go, Mr. Cahill said there is no limit to how many puppies pet stores can keep in one cage, or for how long, as long as they have proper ventilation and lighting, and the cages are cleaned at least once a day. Also, he said there is no limit on the number of dogs a pet store can have; no staff-to-puppy ratio; and no requirement that staff is on site 24-7. Moreover, pet stores are not required to ever take the puppies out of the cages, even if they are not sold for weeks, he said. It is up to the veterinarian who works with the business to recommend if more exercise is required, he said.

4

However, Mr. Cahill said he was not aware of the allegation that Laughlin staff was bringing breeding dogs from the kennels into the pet store in the basement to have their puppies in whelping rooms. The kennel and pet store operations are supposed to be kept separate, he said.

...

Oxford Animal Control Officer Kelly Flynn said she has inspected the kennels and was allowed into the basement at Laughlin, but said she has never entered a whelping room because she did not want to disturb mothers giving birth.

Oxford Selectman John G. Saad said he was not aware the town has the authority to limit the number of dogs at a kennel. He said he thought the state took over permitting kennels. When a reporter told him Mr. Fink said the business has 90 to 120 dogs at a time, Mr. Saad was shocked.

"If the town has the ability to set limits on the number of animals it is incumbent on the town to do something about that," he said. "If a facility right now is overcrowded to the point it affects the health and well-being of an animal, I agree (with those who oppose it) something should be done. The town has the responsibility to do it and we should do something. On the surface, it doesn't sound like the way you would want an animal to be treated."

...

After putting a nonrefundable deposit down on a puppy, the couple said they were told it had lost weight and were given inconsistent statements by staff at Laughlin. The couple said they were also told they could not see where the puppies were kept, were not given a direct answer as to how the puppy was weaned and were not provided the vet's name as requested.

5.  The matter so published concerning the plaintiff is false and defamatory.

6.  At the time of such publication, the defendant knew or could with the exercise of reasonable

    care have ascertained that the matter was untrue and defamatory of plaintiff.

7.  The author of the story, Paula Owen, wrote the story with the intention of creating a "hit

    piece" against the Plaintiff.

8.  The author of the story, Paula Owen, is partially ideologically motivated in that she is

    opposed to animal ownership and traditional farming practices.

9.  The author of the story, Paula Owen, was motivated by personal animus against an employee

    of Laughlin Kennel, with whom she has a personal grudge.

10. The author of the story initially reached out to the kennel with a set of incomplete public

    records comprising 39 pages and requested the kennel "respond to the allegations" but would

    not further clarify.

11. The author of the story, apparently believing the legal analysis of an online anonymous blog, reached out to the kennel regarding their vaccination procedures. Plaintiff provided the Defendant with a State Veterinary Board inspection report from the same day and a contact at the State Veterinary Board who would be happy to re-assure her of the legality of the procedures employed by the Plaintiff.

12. The author, Paula Owen, was dissatisfied with receiving such a response, and never reached out to the Plaintiff again, preferring to remain willfully ignorant in an effort to maximize the allegations she could make without regard to their truthfulness.

13. The author's "watchdog editor" Gerard Russell promised to provide the Plaintiff with a list of written questions, which the Plaintiff agreed to answer.

14. The Defendant never sent a list of written questions to the Plaintiff, despite a meaningful length of time between the original deadline and the final publication date.

15. The Defendant fabricated the claim that the Plaintiff would not now likely win state licensing approval.

## COUNT I LIBEL- CONCERNING ALLEGATIONS THE KENNEL OPERATES THROUGH LEGAL LOOPHOLES OR THAT TOWN OFFICIALS ARE CONFUSED ABOUT THEIR AUTHORITY TO REGULATE THE BUSINESS

16. Defendant maliciously and falsely published in their newspaper allegations that "Town officials are confused about their authority to regulate the business" and "Oxford dog breeder may benefit from officials' ignorance of law."

17. Defendant knew, or would have known with the exercise of ordinary care, that the kennel presently has 25 adult dogs, all of which are kept in the breeding kennel.

6

18. Defendant knew or would have known with the exercise of ordinary care that the town regulates the breeding kennel, but not the pet shop.

19. Defendant knew or would have known with the exercise of ordinary care the Town of Oxford Massachusetts has a right to farm by-law and under the Commonwealth of Massachusetts' constitution (Article 97) which would not allow the arbitrary limitation of dogs on the property.

20. Defendant spoke with and corresponded with several people who could have addressed this point of confusion for her, including the Town Clerk of Oxford, the Oxford Animal Control Officer, the Director of the Division of Animal Health, or even the Plaintiff.

21. On information and belief the Defendant did ask the Director of the Division of Animal Health, but did not like the answer.

22. Instead, Defendant opted to blindly quote an email correspondence from Katie Gronendyke, a spokeswoman for the Executive Office of Energy and Environmental Affairs.

23. By reason of such publication, plaintiff was actually injured. Plaintiff was injured in its business, credit and reputation.

## COUNT II CONCERNING ALLEGATIONS OF INHUMANE CONDITIONS

24. Plaintiff repeats and realleges all prior paragraphs of the Complaint as if set forth fully herein.

25. Defendant maliciously and falsely published in their newspaper allegations that the pups are kept "in cages in the cold darkness of the trucks in the winter or the sweltering heat of summer, sometimes for hours."

26. Defendant intentionally took the quote out of context to imply the dogs were kept in the heat and cold, contrary to the assertion of her source.

27. Defendant maliciously and falsely published in their newspaper the following:

As far as conditions go, Mr. Cahill said there is no limit to how many puppies pet stores can keep in one cage, or for how long, as long as they have proper ventilation and lighting, and the cages are cleaned at least once a day. Also, he said there is no limit on the number of dogs a pet store can have; no staff-to-puppy ratio; and no requirement that staff is on site 24-7. Moreover, pet stores are not required to ever take the puppies out of the cages, even if they are not sold for weeks, he said. It is up to the veterinarian who works with the business to recommend if more exercise is required, he said.[1]

28. Defendant used the above quote to directly state and imply that the Plaintiff: (1) keeps too many puppies in a cage; (2) keeps puppies in a cage for inhumane lengths of time; (3) keeps a poor staff-to-puppy ratio; (4) does not exercise their dogs.

29. Defendant knew all of the above to be untrue at the time of publication.


## COUNT III CONCERNING ALLEGATIONS OF LACK OF CARE AT THE KENNEL

30. Plaintiff repeats and realleges all prior paragraphs of the Complaint as if set forth fully herein.

31. Defendant maliciously and falsely published in their newspaper of or concerning the Plaintiff "Laughlin Kennel employees - often teenagers - are on site from about 8:30 a.m. to 5 p.m., Ms. Casavant said. No one is there after 5 p.m. to take care of problems that might arise, she said."

32. Defendant knew, or would have known with the exercise of ordinary care, that the Plaintiff never closes at 5pm.

33. Plaintiffs hours of operation are listed on their website, and purport to be "7 PM or 8 PM seasonally" and 6PM on Sundays. The Defendant knew or would have known with any care that the last person to check the puppies does not leave until about a half hour after that.

34. Defendant checked the plaintiffs website for other matter according to the article.

8

35. Defendant knew, or would have known with the exercise of ordinary care, that the kennel employs only two teenagers, each in a part time weekend capacity.

## COUNT IV CONCERNING ALLEGATIONS OF USDA VIOLATIONS

36. Plaintiff repeats and realleges all prior paragraphs of the Complaint as if set forth fully herein.

37. Defendant maliciously and falsely published in their newspaper of or concerning the Plaintiff "there is no indication it is inspected by the USDA."

38. Defendant continued to falsely and maliciously allege the Plaintiff was operating in violation of the USDA regulations, stating "Federal regulations require breeders who supply puppies to pet stores to be inspected and licensed by the USDA."

39. Defendant was falsely insinuating, implying, or directly stating the kennel is required to be USDA licensed and inspected in order to sell puppies to itself.

40. Defendant knew, or would have known with the exercise of ordinary care, that the USDA does not require licensing for kennels which sell their own dogs, such as the Plaintiff.

41. Defendant could have obtained this information from countless sources, including the majority of those who were interviewed for the article.

42. Defendant maliciously and falsely published in their newspaper of or concerning the Plaintiff " One of the breeders Laughlin buys from directly also was not licensed by the USDA, she said, though the business claims all of their breeders are licensed."

43. Defendant knew, or would have known with the exercise of ordinary care, that the Plaintiff has never claimed all of their breeders are USDA licensed.

44. Defendant knew, or would have known with the exercise of ordinary care, that the USDA does not require licensing for "hobby breeders," breeders with four or fewer breeding females.

45. Defendant falsely asserts, directly and through insinuation, that the Plaintiff has purchased six week old puppies "from Ohio" through Pinnacle pets.

46. Defendant knew, or would have known with the exercise of ordinary care, that the Plaintiff has never purchased puppies six weeks old for transport.

47. Transporting puppies for sale less than eight weeks old is criminally punishable in Massachusetts.

## COUNT V LIBEL- CONCERNING ALLEGATIONS OF THE PUPPY OF CHRISTINA K. HOLMAN

48. Plaintiff repeats and realleges all prior paragraphs of the Complaint as if set forth fully herein.

49. Defendant maliciously and falsely published in their newspaper of or concerning the Plaintiff that no refund was provided on a puppy the Plaintiff was unwilling to furnish, and that the kennel withheld the name of their treating veterinarian, contrary to law.

50. Defendant knew, or would have known with the exercise of ordinary care, that the above allegation was false, and published it in full knowledge of its falsity.


WHEREFORE:  Plaintiff respectfully requests that this Court Grant the Following Relief:

    A. Judgment for any all civil penalties to which Plaintiff  may be entitled; and

    B. A declaratory judgment that Defendant's  be enjoined from further publication  of defamatory statements of or concerning the defendant; and

    C. Any and all other Relief to which the Plaintiff may be entitled.

Respectfully Submitted:
Plaintiff, by its Attorney:

Dated: Friday, March 11, 2016          By:

John L. Fink, Esq. (BBO #683290)
(508) 433-0529
18 Lyman St. Suite 208
J&N Professional Building
Westborough MA 01581
JFink@WestboroLawyer.com

11

# Exhibit A

# Watchdog Report: Oxford dog breeder may benefit from officials' ignorance of law





T&G Staff/DON LANGREN JR.

   

**By Paula J. Owen**
**Telegram & Gazette Staff  Follow**
**@@PaulaOwenTG**

Posted Jan. 2, 2016 at 8:00 PM
Updated Jan 3, 2016 at 8:01 PM

**» RELATED CONTENT**

• Vet tried to save lab pup sold at Laughlin

OXFORD - A longtime commercial dog breeder and seller, a target of frequent customer complaints and protests, may be benefiting from government officials' ignorance of the law and inattention.

The breeding and pet store business at 11 Larned Road, Laughlin Kennel, has also been the subject of complaints that the business is a nuisance in a residential neighborhood.

Town officials are confused about their authority to regulate the business, and a state official says such a business in its current location would not now likely win state licensing approval.

And some customers of the kennel and pet store continue to allege they were sold sick puppies - some that died shortly after they bought them. Moreover, the customers say local and state officials ignore allegations of poor treatment of the animals at the business.

Numerous complaints are on file with the town from neighbors and customers and written complaints with the Massachusetts Department of Agricultural Resources, attorney general's office and animal-advocacy organizations about kennel conditions and sick dogs purchased from the kennel. There have also been several protests outside the business, including by some members of the group Massachusetts Coalition to End Puppy Mills.

"Puppy mill" is a negative phrase to describe a commercial dog-breeding facility in which the health of the dogs is sometimes disregarded to maintain low overhead costs and maximize profit, according to the Humane Society of the United States. Dozens of U.S. jurisdictions have banned retail pet store sales in an effort to curb commercial breeding, the organization says.

Robert Fink, who owns Laughlin Kennel with his wife, Bridgette, denies allegations of inhumane conditions at the business. In an email to the Telegram & Gazette, Mr. Fink also said he does not sell sick puppies.

All puppies are confined in cages that are suitable for their size, and larger puppies are taken outside for exercise, he said. Every puppy is examined each week by a licensed veterinarian, he assured.

The kennel opened in 1992 when the Finks bought a home and kennel on the property in a residential zone.

Kathleen A. Casavant, a retired Oxford High School teacher who lives across the street, remembers the family who lived there before the Finks. They raised pet German shepherds that they took to shows, Ms. Casavant said. They never had more than about eight dogs at a time, she said.

"When the Finks came in, they subdivided the kennel and got more dogs," she said. "They started off small initially, breeding their own dogs. I had no problem with that. I knew when I moved in there was a kennel there."

Then the Finks started bringing puppies in on crates in trucks, she alleged, for a pet store operation in the home. Puppies were kept in the basement, she said.

"Trucks started coming and they started advertising all different breeds and that is when it got really bad," she said.

The noise, the smells, delivery trucks at all times of the day and night idling while puppies cried inside, she said, made life difficult for her and her family.

Ms. Casavant said she and neighbors turned to the town, but nothing was done.

"Selectmen were appalled by the number of dogs," she said. "They said they would monitor it for six months and then to come back. We went back after six months, but selectmen were not interested in seeing our report. It is like a switch was flipped. Instead of being sympathetic, like they were six months earlier, they didn't want to hear it."

The town only has the authority to license and inspect the kennels and breeding operation; and the DAR licenses and inspects the pet store, according to the state agency.

One of the issues is that Oxford has no regulation to limit the number of dogs in kennels, Ms. Casavant said.

On the town's kennel application, there are three choices: four or fewer dogs, 10 or fewer dogs, or 10 or more dogs. When a reporter asked Town Clerk Lori A. Kelley why there was no upper limit to prevent kennels from having hundreds of dogs, she replied that it was state law not to limit it.

However, according to the DAR, that is not accurate.

"The town has the authority to place an upper limit. That would be up to the ACO (animal control officer) and the town clerk," DAR spokeswoman Katie Gronendyke said in an email.

Ms. Casavant said Laughlin has more than 100 dogs at a time and the Finks moved out of the house years ago. According to the Worcester District Registry of Deeds, the Finks purchased a home on Marsh Road in Sutton in 2010.

Laughlin Kennel employees - often teenagers - are on site from about 8:30 a.m. to 5 p.m., Ms. Casavant said. No one is there after 5 p.m. to take care of problems that might arise, she said.

Ms. Casavant and others also complained to the DAR but received no help, she said. She recently sent a letter to local legislators and Gov. Charles D. Baker Jr. regarding the conditions at Laughlin that she says have deteriorated in recent years.

"The barking that comes from there at night is sometimes unbelievable," she said. "Every Tuesday or Wednesday, the trucks arrive from the puppy mills to unload their cargo. We can

hear the pitiful crying of the puppies as they sit in cages in the cold darkness of the trucks in the winter or the sweltering heat of summer, sometimes for hours."

Former employees took videos and photos showing the conditions at the business, she said. Some were sent to the DAR.

"One of the things that has been most notable is the state's lack of concern regarding this situation," she wrote to state officials. "... I would ask that you investigate this matter and demand an accounting from the MDAR as to why they have ignored the myriad of complaints regarding sick dogs purchased from this place that not only receives dogs from puppy mills but seems to be running their own home-bred version of a puppy mill."

Neighbor Steven R. Thorton has lived across the street from Laughlin for 20 years. He said he is the only neighbor who doesn't have a problem with the barking.

"It doesn't bother me at all. Like it or not, they do a great business over there," Mr. Thorton said. "Everyone says, 'Puppy mill this. Puppy mill that,' but they've got to come from somewhere. How else will everyone get a dog? Like any other business, nothing runs smoothly. I'm sure they are going to have sick dogs."

Courtney L. Derochea, research director for the Massachusetts Coalition to End Puppy Mills, said reports of sick puppies purchased from Laughlin and families stuck with thousands in vet bills are common.

The coalition works with the Massachusetts Society for the Prevention of Cruelty to Animals' advocacy department.

The U.S. Department of Agriculture has authority over commercial breeding operations that supply pet stores with puppies. But, Ms. Derochea said a 2010 audit of the USDA revealed inspectors were not doing their job and not enforcing the Animal Welfare Act.

"A lot of these stores rely on telling people their breeders are USDA-regulated," Ms. Derochea said. "It makes people feel better where their puppies are coming from, but in reality 'USDA breeder' does not mean it's not a puppy mill. A lot of breeders are inspected every year and some of them have received final notices from the USDA for not complying with the Animal Welfare Act."

On its website, Laughlin Kennel says it is a pet shop licensed by the DAR with a kennel license from the town. It says it buys from USDA-licensed breeders, but there is no indication it is inspected by the USDA.

Federal regulations require breeders who supply puppies to pet stores to be inspected and licensed by the USDA.

"Justin and La Nae Jackson, who own a kennel in Clifton, Kansas, supply Laughlin and have been

on the Humane Society's 'worst puppy mill list' every year for years," Ms. Derochea said. "They have years of violations and were given a final notice from the USDA in 2014 that said if they had any more violations they will get their license taken away."

Violations the Jacksons were cited for include repeated failure to provide adequate veterinary care to an injured animal; make an adult available to accompany inspectors; maintain surfaces so they can be readily cleaned and sanitized or are disposable; and keep water receptacles clean and sanitized.

In 2015, despite another violation, the Jacksons are still breeding and Laughlin continues to purchase from them, Ms. Derochea said.

Another problem customers encounter is that the name of the breeder is often not provided until a purchase is complete, she said, which gives prospective buyers little or no time to research where the puppy is coming from.

Many people turn to her group for help, she said, but it is often hard to research breeders, because when they have violations, breeders change their address and name of the kennel, and some families have two or three different kennels.

According to the Humane Society of the United States, Laughlin also gets puppies from brokers - puppy warehouses where many times pet stores have no idea where the puppies are coming from.

Kathleen S. Summers, director of outreach and research for the puppy mills campaign at the Humane Society, based in Washington D.C., said the organization has received dozens of complaints about Laughlin.

According to documents received by the society, Laughlin gets shipments of puppies from out-of-state, including from Missouri brokers.

"They are claiming they know where all of their puppies came from, but when you are buying from a broker or reseller, that is not entirely truthful," Ms. Summers said.

She said one such broker is Pinnacle Pets, a large broker in Missouri, licensed by the USDA to buy and resell puppies.

"We've recently reported Pinnacle Pets to the USDA for possibly receiving underage puppies," Ms. Summers said. "They are under investigation."

Puppies must be at least eight weeks old before leaving a breeding facility, she said. The Humane Society has submitted a complaint, she said, that Pinnacle is getting puppies from breeders from Ohio that sell underage puppies - some only about six weeks old at risk of becoming sick, she said.

In those cases, very young pups take the journey by truck from Ohio to Missouri and then are resold and shipped by truck to Laughlin and other pet stores in the Northeast, she said, traveling more than 1,850 miles.

"There are thousands of puppies moving through Pinnacle yearly," Ms. Summers said.

Also, the society has documentation that Pinnacle buys from unlicensed breeders, she said.

One of the breeders Laughlin buys from directly also was not licensed by the USDA, she said, though the business claims all of their breeders are licensed.

"We pull a sampling of small-animal health certificates that travel with the dog when it crosses state lines," Ms. Summers said. "According to these documents, one person doesn't have a USDA license."

According to inspection reports, Ms. Summers said, one of their breeders, Karen Schmidt from S C R Kennels in Hartville, Missouri, was cited for repeat violations last year and denied inspectors access to the breeding facility twice. In 2013, the same breeder was cited for a strong odor of rodents' feces and urine in the food storage area, and feces near and around food surfaces. She did pass an inspection in February. She has not been inspected since, she said.

Referring to Laughlin Kennel, Ms. Summers said, "We get a lot of complaints from people who went there and didn't like what they saw," Ms. Summers said. "Puppies are pulled out of the basement, not in good condition. It is a facility we are concerned about. There seems to be a number of red flags. We often hear they won't let people see where they keep them in the basement and people are concerned what it is like down there."

Michael Cahill, director of the division of animal health at the DAR, said there is an "unwritten" policy not to license pet stores in homes any longer because inspectors have had trouble gaining access to some in the past. He said there are only a "handful" left in the state.

As far as conditions go, Mr. Cahill said there is no limit to how many puppies pet stores can keep in one cage, or for how long, as long as they have proper ventilation and lighting, and the cages are cleaned at least once a day. Also, he said there is no limit on the number of dogs a pet store can have; no staff-to-puppy ratio; and no requirement that staff is on site 24-7. Moreover, pet stores are not required to ever take the puppies out of the cages, even if they are not sold for weeks, he said. It is up to the veterinarian who works with the business to recommend if more exercise is required, he said.

However, Mr. Cahill said he was not aware of the allegation that Laughlin staff was bringing breeding dogs from the kennels into the pet store in the basement to have their puppies in whelping rooms. The kennel and pet store operations are supposed to be kept separate, he said.

In an email, Mr. Fink says every complaint made to the DAR was "investigated contemporaneously and found to be without merit."

"We sell about 30 puppies a week," he said. "We have 90 to 120 puppies in house at any given time."

He added, "The cages are designed so that nothing can fall from one cage to one below, as is required by regulation."

"Our immunization protocols and all treatments are prescribed by our veterinarian and are administered by us," he said. "This is not only legal; it is required. It is how our regulators, and anyone else who cares about the puppies would want treatment to be done."

Oxford Animal Control Officer Kelly Flynn said she has inspected the kennels and was allowed into the basement at Laughlin, but said she has never entered a whelping room because she did not want to disturb mothers giving birth.

Oxford Selectman John G. Saad said he was not aware the town has the authority to limit the number of dogs at a kennel. He said he thought the state took over permitting kennels. When a reporter told him Mr. Fink said the business has 90 to 120 dogs at a time, Mr. Saad was shocked.

"If the town has the ability to set limits on the number of animals it is incumbent on the town to do something about that," he said. "If a facility right now is overcrowded to the point it affects the health and well-being of an animal, I agree (with those who oppose it) something should be done. The town has the responsibility to do it and we should do something. On the surface, it doesn't sound like the way you would want an animal to be treated."

Chloe Gotsis, spokeswoman for Attorney General Maura Healey, said her office has received 12 complaints against Laughlin Kennel since 2009, including three this year.

The complaints "generally regard allegations that it's a puppy mill and that there is inhumane treatment of animals," Ms. Gotsis said in an email.

In response to questions about ongoing complaints about his business, Mr. Fink said in an email to the newspaper that all animals are healthy when sold and go home with a 14-day money-back guarantee.

"Our record with the state Department of Agriculture is very good," he said.

"We are not a problem facility which can be verified for yourselves by contacting the Department of Agriculture Resources, Division of Animal Health," he said.

He added, "To ensure the health of our pups, we do the following. New arrivals are quarantined for 48 hours. They are vet checked after that period and then every subsequent week until they go home. Any hint of illness disqualifies the puppy from sale by us. At the time of sale, we examine the puppy ourselves and request the purchaser to do so as well. Everyone must agree that the puppy is healthy to all appearances, else we do not sell the pup."

In one complaint, on file in the town's Board of Health office, Christina K. Holman and her boyfriend Paul T. Arnold Jr., an attorney from Sandwich, who tried to buy a Boston terrier puppy from Laughlin in 2013, said in a letter to the attorney general's office that they were concerned about inhumane treatment of the puppies at the facility.

After putting a nonrefundable deposit down on a puppy, the couple said they were told it had lost weight and were given inconsistent statements by staff at Laughlin. The couple said they were also told they could not see where the puppies were kept, were not given a direct answer as to how the puppy was weaned and were not provided the vet's name as requested.

"I also asked for the breeder's name and was given the name of Brigete Rucker from Macon, Missouri," the couple's letter said. "This raised tremendous red flags for us because we discovered online that puppies transported from Macon, Missouri, to Massachusetts kennels, and Laughlin was one of them, the puppies were treated in a very abusive manner (cramped, nonventilated quarters, undernourished, lying in their own and others' waste, low weight, to name a few allegations.) Please find enclosed the article on animal cruelty charges involving Laughlin Kennels."

The couple enclosed several photos, four pages of negative reviews of the business and two news articles, including one from the Telegram & Gazette in 2009 about a Missouri man who was charged with animal cruelty after delivering puppies to the Oxford business.

Police said that 27 puppies were crammed into small cages, surrounded by animal waste, filth and flies, in a locked box truck parked in front of the now-closed Elite Puppies on Main Street in Webster. It was reported that there appeared to be five puppies in each cage and one was unresponsive. A manager at Laughlin Kennel said nine puppies from the same van were delivered there that night, the Telegram reported on July 10, 2009.

Elite Puppies closed earlier this year after a series of protests outside the business.

Some Elite Puppies customers had made allegations similar to those of Laughlin customers that the Webster business was selling sick dogs. The DAR fined owner Jennifer L. Gardner $2,000 on Nov. 18, 2014, for violations. It was the first administrative actions taken by the agency against Elite Puppies despite dozens of complaints about sick puppies purchased there over eight years.

Mr. Fink confirmed that Ms. Gardner now works for him at Laughlin.

"When I hired Jen Gardner as my assistant, I immediately notified the Department of Agriculture. They were glad to hear that she had found employment. They gave me no warnings or cautions regarding her employment here," Mr. Fink said.

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT

Worcester, ss.

Superior Court Division of the
Trial Court

Laughlin Kennel Company

        Plaintiff,

v.

Gatehouse Media Inc. DBA
Worcester Telegram and Gazette

        Defendant.

Civil Action Number:

16 0398 ▷

**FILED**

MAR 15 2016

ATTEST: _____ CLERK

## EX-PARTE MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER UNDER MRCP RULE 4(C)

Now comes the Plaintiff, who hereby move this Honorable Court pursuant to MRCP Rule

4(c) for appointment of Constable Jason Burke of AAA Constable service in Lowell MA, or an

agent of his who is over eighteen ( 18) years of age, and not an interested party in this matter, to

serve process in this action.

Respectfully Submitted:
Plaintiff, by its Attorney:

Dated: Friday, March 11, 2016

By: _____
John L. Fink, Esq. (BBO #683290)
(508) 433-0529
18 Lyman St. Suite 208
J&N Professional Building
Westborough MA 01581
JFink@WestboroLawyer.com

## ORDER

The within appointment is allowed, and it is ordered that a copy of this order shall be
served with the summons and complaint or other process served.

1

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT

Worcester, ss.

Superior Court Division of the
Trial Court

Laughlin Kennel Company

Plaintiff,

v.

Gatehouse Media Inc. DBA
Worcester Telegram and Gazette

Defendant.

Civil Action Number: **16  039 ⅜ D**

# FILED

**MAR 15 2016**

ATTEST: _[signature]_ CLERK

## EX-PARTE MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER UNDER MRCP RULE 4(C)

Now comes the Plaintiff, who hereby move this Honorable Court pursuant to MRCP Rule 4(c) for appointment of Constable Jason Burke of AAA Constable service in Lowell MA, or an agent of his who is over eighteen ( 18) years of age, and not an interested party in this matter, to serve process in this action.

Respectfully Submitted:
Plaintiff, by its Attorney:

Dated: Friday, March 11, 2016

By: _[signature]_

John L. Fink, Esq. (BBO #683290)
(508) 433-0529
18 Lyman St. Suite 208
J&N Professional Building
Westborough MA 01581
JFink@WestboroLawyer.com

_[handwritten annotation]_
Allowed
Tuckes J x11-st
Nw opoln b/c
3-15-16

## ORDER

The within appointment is allowed, and it is ordered that a copy of this order shall be served with the summons and complaint or other process served.

1

# COMMONWEALTH OF MASSACHUSETTS

Worcester, ss.

Superior Court
Department of the Trial Court
of the Commonwealth
Civil Action

No. _____

*Caughlin Kennel Company*

Plaintiff (s)

**SUMMONS**

v.

*Gatehouse Media Inc*
*DBA Worcester Telegram & Gazette*   Defendant (s)

To the above named Defendant:

      You are hereby summoned and required to serve upon ............................
.............................................................................., plaintiff's attorney,
whose address is ..........................................................................,
an answer to the complaint which is herewith served upon you, within 20 days after
service of this summons upon you, exclusive of the day of service. If you fail to do so,
judgement by default will be taken against you for the relief demanded in the complaint.
You are also required to file your answer to the complaint in the SUPERIOR COURT
Department of the Trial Court at WORCESTER either before service upon plaintiff's
attorney or within a reasonable time thereafter.

      Unless otherwise provided by Rule 13 (a), your answer must state as a counter-
claim any claim which you may have against the plaintiff which arises out of the
transaction of occurrence that is the subject matter of the plaintiff's claim or you will
thereafter be barred from making such claim in any other action.

      Witness   **Judith Fabricant**   Esquire, at Worcester, the..........................
day of ...................................................... in the year of our Lord two thousand and

**Clerk**

NOTES
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption.
   If a separate summons is used for each defendant, each should be addressed to that particular defendant.

PLEASE CIRCLE TYPE OF ACTION INVOLVED: TORT — MOTOR VEHICLE TORT —
CONTRACT-EQUITABLE RELIEF — CH 93A — MEDICAL MALPRACTICE — OTHER

NOTICE TO DEFENDANT: You need not appear personally in court to answer the complaint, but
if you claim to have a defense, either you or your attorney must serve a copy of your written
answer within 20 days as specified herein AND also file the original in the Clerk's Office, Superior
Court, Room 1008.

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on .................................................................
20............. I served a copy of the within summons, together with a copy of the complaint in this action,
upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4(d) (1-5):

....................................................................................................................................

....................................................................................................................................

....................................................................................................................................

Dated: ..................................................... 20 ..............

**N.B. TO PROCESS SERVER:**

PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN THIS BOX
ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.

3 / 29 / 20 16

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss.

Superior Court
Civil Action

No.

Laughlin Kennel Company, Plaintiff

v.

Gatehouse Media, Inc. Defendant

SUMMONS

(Mass. R. Civ. P. 4)